Todd A. Seaver (SBN 271067)
Matthew D. Pearson (SBN 235339)
Carl Hammarskjold (SBN 280961)
Colleen Cleary (SBN 306659)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Telephone:  (415) 433-3200
Facsimile:  (415) 433-6382
Email: tseaver@bermantabacco.com
         mpearson@bermantabacco.com
         chammarskjold@bermantabacco.com
         ccleary@bermantabacco.com

Christian Levis (*pro hac vice* forthcoming)
Amanda Fiorilla (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Email: clevis@lowey.com
         afiorilla@lowey.com

Anthony M. Christina (*pro hac vice* forthcoming*)*
**LOWEY DANNENBERG, P.C**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone: (215) 399-4770
         Email: achristina@lowey.com

*Attorneys for Plaintiff Matthew Blomquist*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| MATTHEW BLOMQUIST, individually and on behalf of himself and all other persons similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ALTRIA GROUP, INC., and JUUL LABS, INC.,<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

CLASS ACTION COMPLAINT

Plaintiff Matthew Blomquist ("Plaintiff"), individually, by and through the undersigned counsel, brings this class action lawsuit against Defendants Altria Group, Inc. ("Altria") and Juul Labs, Inc. ("Juul"), on behalf of himself and all others similarly situated, and alleges, based upon information and belief and the investigation of counsel as follows:

## INTRODUCTION

1.     This case involves a series of anticompetitive agreements between Altria and Juul, in which Altria agreed to refrain from competing with Juul and exit the closed-system electronic cigarettes ("e-cigarettes") market in exchange for a 35% ownership interest in Juul.

2.     The closed-system e-cigarettes market emerged as an alternative to traditional smoking. Unlike traditional smoking, which involves heat-drying tobacco leaves, e-cigarettes deliver nicotine to the user by vaporizing a liquid nicotine solution. Closed-system e-cigarettes deliver the liquid nicotine in pre-filled, sealed cartridges. This alternative to traditional smoking quickly gained traction, increasing from seven million users in 2011 to 41 million users in 2018. During this same period, traditional smoking had steadily declined.

3.     Altria, the leading seller of traditional cigarettes, such as Marlboro, understood the necessity of developing a product in the rapidly emerging closed-system e-cigarette market in light of declining sales of traditional cigarettes. In August of 2013, Altria launched the MarkTen through its subsidiary Nu Mark, a product Altria invested substantial resources and funds to develop and market. Altria also leveraged its position in the traditional smoking market to obtain highly coveted shelf space in retailers across the United States to sell the MarkTen. Altria's efforts were successful, as the MarkTen became the second most popular closed-system e-cigarette brand by market share.

4.     Two years later, Juul rebranded and quickly became a leading seller of e-cigarettes. In 2016, Juul's sales had skyrocketed 700% and by 2017, the company had captured a third of the closed-system e-cigarette market.

5.     Altria made several attempts to acquire, or eliminate, Juul. For years Altria and Juul aggressively competed with one another, often monitoring each other's e-cigarette prices and racing against one another for the newest innovations. Altria, aware of Juul's success, went

so far as to release a similar pod-based product called the MarkTen Elite in an attempt to recapture the market.

6. Despite these efforts, by 2018 Juul had obtained 75% of the closed-system e-cigarette market. Altria, acknowledging the market share Juul had acquired, began to seriously pursue negotiations with Juul in the summer of 2018. In exchange, Juul demanded that Altria exit the closed-system e-cigarette market as a non-negotiable precondition before any deal could proceed. Negotiations came to a halt with Altria unwilling to concede to Juul's demands. After months without any progress, Altria ultimately agreed to Juul's request in early October 2018 and began pulling its products from the market as part of its agreement with Juul. On December 19, 2018, Altria discontinued all sales of its e-cigarette products.

7. Just one day later, on December 20, 2018, Altria and Juul announced that they had executed a Purchase Agreement and related agreements (collectively, "the Transaction"). Pursuant to the agreement, Altria purchased a 35% non-voting stake in Juul, convertible to a voting stake conditioned upon Hart-Scott Rodino ("HSR") approval. In addition, Juul and Altria executed (i) a Relationship Agreement, containing a non-compete provision prohibiting Altria from competing in the relevant market; (ii) a Service Agreement, under which Altria agreed to provide support services to Juul; (iii) an Intellectual Property License Agreement, licensing Altria's e-cigarette intellectual property to Juul; and (iv) a Voting Agreement, which provided Altria with representation on Juul's Board of Directors ("Board"). Upon HSR approval, Altria was also granted the right to appoint one of its executives to a non-voting observer position on Juul's Board.

8. Altria's orchestrated exit from the closed-system e-cigarette market in exchange for a portion of Juul's profits not only eliminated its existing products from the market, but, through the Non-Compete Agreement, halted ongoing innovation towards developing a new and improved line of products. Thus, customers lost the benefit of competition between Altria and Juul, and Altria and other competitors.

9. The Transaction eliminated Altria from the relevant market and any threat to Juul's market dominance. In fact, the Transaction only further ensured Juul's controlling share

in the market, as Altria had promised to provide Juul with its extensive resources, including its line of distribution and coveted shelf space at retailers across the United States.

10.     Because Juul had a dominant position in the market, after eliminating its competition Altria, it was able to charge supracompetitive prices for its products. Altria, in exchange for removing itself from the market, was able to share in these excessive profits as a result of their agreement.

11.     No additional market participants could offset the anticompetitive effects of the Transaction. First, for existing manufacturers to develop and market a competing product would require extensive time and capital funds, including money for product development or product acquisition. Second, new market participants face the burden of high entry barriers, including those set by the U.S. Food and Drug Administration ("FDA"), which require a complex, lengthy, and expensive regulatory process before a new product can receive approval.

12.     Defendants cannot show the Transaction resulted in cognizable market benefits sufficient to outweigh the harm to competition caused by the Transaction. Nor can they point to any pro-competitive benefits that could not be achieved through less restrictive means.

13.     Defendants' conduct has illegally restrained competition in the relevant market in violation of federal antitrust laws. As a direct and proximate result of Defendants' anticompetitive conduct, consumers and entities that purchased Juul products were overcharged and denied the benefits of innovation from a competitive market.

## THE PARTIES

14.     Plaintiff Matthew Blomquist is a resident of New Jersey. Matthew Blomquist purchased Juul products directly from Juul through the Juul.com website during the relevant period, including on September 13, 2019 and October 13, 2019.

15.     Defendant Juul is a Delaware corporation with its principal place of business in San Francisco, California. Juul is the leading manufacturer of closed-system e-cigarette devices with projected revenue of $3.4 billion in 2019.

16.     Defendant Altria is a Virginia corporation with its principal place of business in Richmond, Virginia. Altria is one of the world's largest producers and marketers of tobacco

products worldwide and, prior to its agreement with Juul, was a manufacture of closed-system e-cigarette devices through its subsidiary Nu Mark.

**JURISDICTION AND VENUE**

17.     This Court has jurisdiction over this action pursuant to Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, respectively, and pursuant to 28 U.S.C. §§ 1331, 1337.

18.     This Court has general personal jurisdiction over Juul because Juul maintains its principal place of business in this District in San Francisco, California.

19.     This Court has specific personal jurisdiction over Altria because Altria has substantial contacts in this District out of which this cause of action arises. For example: (i)  Altria marketed its products in this District; (ii) Altria sold to consumers in this District; (iii) Altria entered an unlawful anticompetitive agreement with Juul in this district; and (iv) Altria engaged in a scheme and conspiracy with its co-conspirator Juul in this District.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Juul's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

**INTRADISTRICT ASSIGNMENT**

21.     Assignment to any division in this District is proper because the interstate trade and commerce involved and affected by the violations of the antitrust laws was and is carried out within each division. Defendant Juul Labs, Inc. has its principal place of business in the San Francisco division.

**FACTUAL ALLEGATIONS**

I.     **INDUSTRY BACKGROUND**

     A.     **Decline of Traditional Tobacco**

22.     Prior to the twentieth century, the negative health effects of tobacco were largely unknown. Although several studies began to confirm the correlation between smoking and cancer by the early 1950's, the general public still remained largely unaware of the potential health risks. It wasn't until 1952, when Reader's Digest published "Cancer by the Carton," a

watershed article detailing the dangers of smoking, that the public finally began to take notice of the possible health consequences of cigarette smoking. The article had a tremendous impact and spawned several similar reports in other periodicals. The following year, cigarette sales declined for the first time in over two decades.

23.     In the early 1960s, the tobacco industry suffered another blow with the formation of the Surgeon General's Advisory Committee on Smoking and Health. The committee was commissioned in response to political pressures and the growing body of scientific evidence suggesting a causal relationship between smoking and cancer. In 1964, the committee released a 387-page report entitled "Smoking and Health." In unequivocal terms, it concluded that cigarette smoking is causally related to lung cancer.

24.     The formation of the Surgeon General's Advisory Committee marked the start of an epic battle between public health and big tobacco. In 1965, Congress passed the Federal Cigarette Labeling and Advertising Act requiring the Surgeon General's warnings on all cigarette packages. In the 1970's, all broadcast advertising of cigarettes was banned. Two decades later, smoking was banned on all interstate buses and all domestic airline flights lasting six hours or less. Despite the tumultuous onslaught of government regulation, the tobacco industry remained financially unscathed until the 1990's.

25.     In 1994, Mississippi filed the first of 22 state lawsuits seeking to recoup millions of dollars from tobacco companies for smokers' Medicaid bills. And on June 20, 1997, the tobacco companies and state attorneys general announced a landmark $368.5 billion agreement to settle the massive lawsuits against cigarette makers. The litigation ultimately exposed the tobacco companies' knowledge and exploitation of nicotine addiction, cigarettes as a nicotine-delivery system, and their targeted recruitment of "pre-smokers."

26.     Starting in 1990, the sustained campaign to discourage Americans from smoking began to fully take effect, including: (i) high taxes on cigarettes; (ii) smoking bans in bars, restaurants, workplaces, airports, airplanes, trains, and other enclosed spaces; (iii) requiring smoking in restricted areas; (iv) restrictions on advertising; (v) ban on the sale to minors; (vi) higher health care premiums to penalize smokers;  (vii) local and state smoking cessation

programs; and (viii) and other severe restrictions instituted by the Tobacco Master Settlement Agreement ("MSA").

27.     The MSA was entered in November 1998, originally between the four largest U.S. tobacco companies, Philip Morris Inc., R.J. Reynolds, Brown & Williamson and Lorillard (the original participating manufacturers) and the attorneys general of 46 states. The MSA restricts certain conduct by participating manufacturers, including advertising and certain lobbying activities, created a national tobacco control foundation, and dismantled several tobacco industry initiatives. Specifically, it imposed significant prohibitions and restrictions on tobacco advertising, marketing, and promotional programs or activities. For example, it prohibits or restricts: (i) direct and indirect targeting of youth; (ii) use of cartoon characters; (iii) billboards, transit ads, and other outdoor advertising not in direct proximity to a retail establishment that sells tobacco products; (iv) product placements in entertainment media; (v) free tobacco product samples (except in adult-only facilities); (vi) gifts to youth in exchange for proofs of purchase; and (vii) branded merchandise and brand name sponsorships.

28.     The MSA additionally prohibited certain practices that seek to hide negative information about smoking and created a tobacco prevention foundation, the American Legacy Foundation (now known as the Truth Initiative), a research and educational organization that focuses its efforts on preventing teen smoking and encouraging smokers to quit. The foundation is responsible for "The Truth" advertisement campaign,  which has had success in reducing youth smoking.

29.     The MSA dismantled key tobacco industry initiatives and prohibits participating manufacturers from creating other industry-wide groups unless such groups agree to act in a manner consistent with the MSA's provisions. It also requires participating manufacturers to make available online the non-privileged documents they disclosed during the discovery phase of the tobacco litigation. These efforts fostered the dramatic reduction in cigarette smoking in the 21st century. Current smoking has declined from 20.9% (nearly 21 of every 100 adults) in 2005 to 13.7% (nearly 14 of every 100 adults) in 2018, and the proportion of ex-smokers has continued to increase.

30.     The following chart illustrates the growth and decline of cigarette consumption in the United States. In 1900, on a per-capita basis, American adults smoked approximately 54 cigarettes per year. That number increased almost exponentially until its peak in 1963, when an estimated 4,345 cigarettes were consumed per adult in that year alone. When tobacco use peaked in the mid-1960s, more than 40 percent of the U.S. adult population smoked cigarettes (National Center for Health Statistics 2005).



Per capita consumption of cigarettes among adults ages 18 years and older from 1900 to 2004. SOURCES: (ALA 2004, 2006; Capehart 2004).

**B.    Emergence of Nicotine Delivery Alternatives**

31.     Nicotine fuels the economy of addiction. It acts on nicotinic cholinergic receptors, triggering the release of neurotransmitters that produce rewarding psychoactive effects. With repeated exposure, users develop a tolerance to many of the effects of nicotine, thereby reducing its primary reinforcing effects and inducing physical dependence (*i.e.*, withdrawal symptoms in the absence of nicotine, including anxiety, tension, depression, irritability, difficulty concentrating, disorientation, increased eating, restlessness, headaches, sweating, insomnia, heart palpitations, tremors, and intense cravings). Smoking behavior is influenced by pharmacologic feedback and by environmental factors such as smoking cues, friends who smoke, stress, and product advertising.

32.     Tobacco companies have been capitalizing on the powerful acceleration of addictiveness for over a century. In response to the remarkable decline in cigarette smoking in America, they have sought to diversify their products by taking advantage of new nicotine delivery systems, such as e-cigarettes.

33.     E-cigarettes have been on the rise since they were first introduced in the United States in the mid-2000's. There are currently two main types of e-cigarettes on the market: open-system and closed-system e-cigarettes. Open-system e-cigarettes include a "tank" that is manually filled with e-liquid. The e-liquid, tank, and other parts are generally customizable. Open-system e-cigarettes are traditionally bulkier in size. In contrast to open-system e-cigarettes, closed-system e-cigarettes often resemble traditional cigarettes and are smaller by design. Closed-system e-cigarettes have sealed pods or cartridges that are disposed and replaced after each use.

34.     According to Euromonitor, the electronic cigarette market has grown from just $50 million in 2005 to an estimated $7.5 billion in 2016. In 2018, the Business Research company estimated the global market for e-cigarettes was approximately $14.05 and expected to grow to $29.39 billion through 2022.

35.     Almost every major tobacco company has sought to enter the market for e-cigarettes. For instance, tobacco giant Reynolds America is the parent company R.J. Reynolds Vapor Company, which produces VUSE brand e-cigarettes. British American Tobacco, the largest tobacco company in Europe, launched Vype, an e-cigarette brand.

36.     Altria viewed participation in the e-cigarette market as essential to its long-term survival. In 2013, Altria entered the market through its subsidiary Nu Mark. Its flagship product was the MarkTen e-cigarette. The following year Altria took steps to acquire Green Smoke, Inc., further expanding its portfolio in the closed-system e-cigarette market.

37.     Tobacco companies like Altria, armed with their extensive knowledge on nicotine addiction and marketing experience in the traditional cigarette market, originally played a large role in the e-cigarette market in the United States. However, another company

would soon surpass all competitors in the market for closed-system e-cigarettes, ultimately becoming a behemoth in the industry.

38.     The main difference between open and closed-system e-cigarettes is the way the e-liquid is delivered to the heating mechanism. Open-system e-cigarettes have a clearomizer which is filled with e-liquid manually, whereas closed-system e-cigarettes come ready-filled with e-liquid, and screw directly onto the e-cigarette battery. Open-system e-cigarettes also have a removable mouthpiece, whereas the mouthpiece on closed-system e-cigarettes is built into the e-cigarette tank, streamlining the entire mechanism into one portable device.

39.     In 2015, James Monsees and Adam Bowen, two individuals who had already created, marketed, and produced two prior "vapor" products, founded Pax Labs ("Pax"). Pax originally introduced "Juul," a closed-system e-cigarette brand, in June of 2015, along with a marketing campaign called "vaporized." The campaign focused on email marketing, social media marketing, and live events. The Juul launch party was hosted on June 4, 2015 in New York City and was ultimately regarded as success.

40.     Pax, later rebranded as independent company Juul Labs, Inc. in 2017, was relentless in its attempts to capture the market. Borrowing a page out of Big Tobacco's playbook, Juul planned to establish market dominance by targeting non-smokers and younger demographics. Juul advertisements would often feature young models "socializing and flirtatiously sharing" the device. The company also relied on popular hashtags on social media to increase its marketing reach to previously untapped demographics. In February 2020, reports emerged that Juul had gone so far as to purchase ad space on popular children's networks, such as Cartoon Network and Nickelodeon, to target underaged consumers. Several attorneys general have sued the company for its advertising strategy, alleging the marketing campaign is responsible for the surge in teen use of e-cigarette products.

41.     In addition to undercutting the costs of traditional ad campaigns, Juul's marketing efforts were massively effective. According to ABC 7 News, Juul's sales rose 700% in 2016. By the following year the company had captured a third of the closed-system e-cigarette market. Ultimately, Juul acquired approximately 75% of the market by 2018.

## II.   UNLAWFUL AGREEMENT NOT TO COMPETE

42.     Altria, the third largest e-cigarette manufacturer during the relevant period, recognized that it could not effectively compete against Juul in the closed-system e-cigarette market. Rather than try to legitimately capture the market, such as by changing its business strategy or creating innovative products, Altria approached Juul in the summer of 2018 to reach an agreement to ultimately share in Juul's profits.

43.     As a precondition to negotiations, Juul demanded that Altria—one of its main competitors—exit the market for closed-system e-cigarettes entirely. Juul would not agree to negotiate with Altria in the absence of this precondition, which ultimately stalled negotiations for several months. After months without any concessions by Juul, Altria eventually conceded to Juul's demands. Altria began pulling its products from the market in October of 2018, under the guise that the pod system and its selection of flavors were contributing to youth usage. Altria completely discontinued its operations in the closed-system e-cigarette market on December 19, 2019.

44.     The next day, Juul and Altria announced that they had executed the Transaction, which granted Altria 35 percent non-voting equity interest in Juul in exchange for a $12.8 billion cash investment.

45.     Even though Altria was already providing Juul with a substantial cash infusion, which valued the company at more than twice its $15 billion valuation just seven months prior, Altria made several other concessions and agreed to provide certain essential services on Juul's behalf. For example, as discussed above, several other agreements were simultaneously executed, including: (i) a Service Agreement; (ii) a Relationship Agreement; (iii) a Voting Agreement; and (iv) an Intellectual Property Licensing Agreement.

46.     Although Altria had effectively shuttered its doors in the closed-system e-cigarette market in order to enter the Transaction, by virtue of the non-compete contained in the Relationship Agreement, Altria agreed not to re-enter the market unless exclusively through Juul:

[Altria] shall not . . . directly or indirectly (1) own, manage, operate, control, engage in or assist others in engaging in, the e-Vapor business; (2) take actions with the purpose of preparing to engage in the e-Vapor Business, including through engaging in or sponsoring research and development activities; or (3) Beneficially Own any equity interest in any Person, other than an aggregate of not more than four and nine-tenths percent (4.9%) of the equity interests of any Person which is publicly listed on a national stock exchange, that engages directly or indirectly in the e-Vapor Business (other than (x) as a result of [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship of, research and development activities not directed toward the e-Vapor Business and not undertaken with the purpose of developing or commercializing technology or products in the e-Vapor Business) . . . . . . Notwithstanding the foregoing, (x) the [Altria] and its Subsidiaries and controlled Affiliates may engage in the business relating to (I) its Green Smoke, MarkTen (or Solaris, which is the non-U.S. equivalent brand of MarkTen) and MarkTen Elite brands, in each case, as such business is presently conducted, subject to Section 4.1 of the Purchase Agreement, and (II) for a period of sixty (60) days commencing on the date of this Agreement, certain research and development activities pursuant to existing agreements with third parties that are in the process of being discontinued . . .

47.     Altria provided Juul with all the resources necessary to maintain, and further develop, it's dominant market position in the closed-system e-cigarette market. Under the Services Agreement, Altria agreed to both initial and extended services. Altria initially agreed to provide highly coveted convenience store shelf space to Juul, regulatory consulting, and distribution support. Under the extended services, Altria agreed to provide direct marketing support and sales services. The non-compete pursuant to the Relationship Agreement formally went into effect in early 2019, at the time Altria began performing extended services.

48.     Altria similarly granted Juul extensive rights pursuant to the Intellectual Property License Agreement, which provides Juul with a broad, non-exclusive, irrevocable license to Altria's e-cigarette intellectual property portfolio.

49.     On January 30, 2020, Defendants announced amendments to their agreement, including: (i) an Amended Purchase Agreement; (ii) an Amended Relationship Agreement; (iii) an Amended Services Agreement; and (iv) a Revised Voting Agreement.

50.     The Revised Voting Agreement provided that, after the Antitrust Conversion, Altria would have the right to: (i) appoint two out of nine directors on Juul's Board; (ii) nominate one of three independent directors; (iii) appoint one of four members of a

Nominating Committee, who would have the right to veto independent director nominations; (iv) appoint two of five members and the chair of a new Litigation Oversight Committee, which would have responsibility for managing litigation involving both Altria and Juul, *i.e.*, "Joint Litigation Matters"; and (v) appoint one of three members of a Litigation Subcommittee, which would have authority, by unanimous vote, to change Juul's senior outside counsel responsible for Joint Litigation Matters. The Revised Voting Agreement additionally granted Juul's Chief Executive Officer ("CEO"): (i) a board seat; (ii) a seat on the Litigation Oversight Committee; and (iii) a seat on the Litigation Subcommittee.

51.     Pursuant to the Amended Services Agreement, Altria was only obligated to provide regulatory support services. The amendment went into effect at signing, except with respect to Altria's obligation to provide retail shelf space to Juul, an essential service for maintaining its market share, which terminated after March 31, 2020.

52.     Pursuant to these various agreements, Juul was able to maintain, and further, its dominant share in the market for closed-system e-cigarettes. In the absence of Altria's necessary market competition, Juul was able to capitalize on its heightened position in the market and charge supracompetitive prices to consumers and distributors. Altria directly benefitted from these supracometitive prices due to its 35% interest in Juul.

## III.    THE FTC ACTION

53.     On April 1, 2020, the Federal Trade Commission ("FTC") filed an administrative complaint against Juul and Altria, alleging their series of agreements, including Altria's acquisition of a thirty-five percent stake in Juul, restrained competition in violation of federal antitrust laws.

54.     The FTC brought claims against Defendants pursuant to Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), and Section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), alleging their agreements violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 7 of the Clayton Act, 15 U.S.C. § 18.

55.     The FTC contends that Defendants' agreements unreasonably restrained trade in the U.S. market for closed-system e-cigarettes. As a result of Defendants' agreement, competition for closed-system e-cigarettes was substantially lessened and innovation for future products was effectively halted.

56.     The FTC sought several forms of relief, including: (i) restoring incentives to compete in the relevant market, including Altria divesting its equity stake in Juul, rescission of Altria's purchase in Juul, and other appropriate relief; (ii) voiding all agreements related to the Transaction, as well as prohibiting future non-compete agreements amongst Defendants; (iii) prohibiting transactions between Altria and Juul that combine their business in the market for closed-system e-cigarettes, unless prior approval is granted by the Commission; (iv) prohibiting officers or directors on either board from serving on the other Defendants' respective board of directors and from attending its meetings; and (v) certain compliance monitoring and prior notice to the Commission.

**IV.     THE RELEVANT MARKET**

57.     The relevant market in this action is the closed-system e-cigarette market.

58.     The market for e-cigarettes is essentially split into two distinct markets for e-cigarettes: the market for open-systems and closed-systems. Both systems rely on "e-liquid," which deliver a certain percentage of nicotine to the user.

59.     In a closed system there are essentially two pieces of equipment: the base, consisting of the battery and the heating mechanism, and either a sealed cartridge or pod. The base is rechargeable, and the cartridge or pod comes pre-filled with e-liquid. The e-liquid, flavor, and base cannot be customized. The cartridge or pod itself is disposable: once the e-liquid is used, the cartridge is thrown away and replaced with a new one. A typical disposable cartridge of e-liquid contains .5% nicotine, although percentages can vary as low as 0%. These devices are typically small and often inconspicuous. For instance, the Juul is often compared to a USB drive. A Juul device, the heating and battery housing unit, retails for $19.99. A price of four Juul pods, disposable e-liquid, currently costs $15.99 on Juul's website.

60.     In an open system, there is no cartridge to dispose of. Rather, the device itself is refilled with e-liquid in a "tank." Users of open-system e-cigarettes can customize the e-liquid they deposit into the system, including the possibility to combine several e-liquids to create unique flavors. Open-system e-cigarettes tend to deliver a higher level of nicotine and users can customize the strength of their device, *i.e.*, the level of nicotine they receive per use. The devices themselves are generally much larger and bulkier than closed-system e-cigarettes and the initial costs of the device are substantially higher, costing as much as $150.00, if not higher. The devices include interchangeable parts, such as coils, atomizer, and the tanks themselves. Users buy e-liquid by the bottle, in varying percentages of nicotine, which typically ranges from $10.00 to $30.00.

61.     The market for closed and open e-cigarette systems are vastly different, in terms of both demographics and price range. For instance, closed-system e-cigarettes are routinely sold in convenience stores and gas stations and are easily accessible to consumers. For example, in 2016, the MarkTen, produced by Altria, was available in over 70,000 retailers. By contrast, open-system e-cigarettes are normally only available in specialty vape shops, which are less accessible to an everyday consumer. Additionally, the market for open-system e-cigarettes have routinely suffered from product safety issues, ultimately deterring a large portion of consumers.

62.     Altria and Juul were direct competitors with one another in the closed-system market. As discussed above, Altria and Juul were head-to-head competitors in terms of bringing the latest innovations to market and often price-based their products in relation to one another. Given the vast difference in demographic, accessibility, and price, Altria and Juul did not consider manufacturers in the open-system e-cigarette market as competitors.

63.     There are no reasonable alternatives to closed-system e-cigarettes. Closed-system e-cigarettes are easily accessible, low-maintenance, cost-conscientious, and conspicuous. The only counterpart available on the market, open-system e-cigarettes, are not nearly as accessible, sell at a higher price point, and are bulkier in form.

64.     The geographic market is limited to the United States, as FDA requirements forbid the importation of e-cigarettes without prior FDA approval.

## V.    MARKET POWER

65.    The market for closed-system e-cigarettes is extremely limited. For instance, four companies make up approximately 95% of the entire market for closed-system e-cigarettes.

66.    Throughout the Class Period Juul consistently maintained a dominant market share. In August 2018, Juul possessed 72% of the entire market. By comparison, Altria maintained 7.5% market share.



67.    Approximately one month after Altria began leaving the market, Juul's market share increased to 75.3%. Altria's market share, on the other hand, had dropped to 4.4%.



68.     Following the Transaction, Juul's market dominance continued to grow, as demonstrated by common metrics used to gauge market concentration.

69.     Federal agencies often rely on the Herfindahl-Hirschman Index ("HHI") to measure concentration in a particular market. Under the Merger Guidelines, promulgated by the Antitrust Division of the Department of Justice and FTC, a merger is presumably illegal (because it excessively creates or enhances market power) when the post-merger HHI score exceeds 2,500 and the merger increases the HHI by 200 points or more.

70.     Following the Transaction, the U.S. market for closed-system e-cigarettes resulted in an HHI score that exceeded 2,500, with an increase in HHI by more than 200 points. Therefore, Juul and Altria—through its 35% interest in Juul—possessed overwhelming market power following the Transaction.

## VI.    ANTICOMPETITIVE EFFECTS

71.     Altria and Juul were head-to-head competitors in the closed-system e-cigarette market during the relevant time period, with Juul maintaining approximately 75% market share in 2018.

72.     While Altria attempted to negotiate either an acquisition or merger with Juul in 2018, Juul executives demanded that Altria cease all operations in the closed-system e-cigarette market before they would engage in any meaningful negotiations.

73.     On July 30, 2018, Nick Pritzker, a Juul Board member, emailed Howard Willard, the CEO of Altria, an open term sheet for discussions. The term sheet included that Altria must withdraw from the closed-system e-cigarette market.

74.     On August 1, 2018, representatives for Altria and Juul met in Washington, DC to discuss the terms of the merger. The attendees consisted of Nick Pritzker and Riaz Valani, two members of Juul's Board, Kevin Burns, Juul's CEO, Howard Willard, Altria's CEO, and Billy Gifford, Altria's CFO. No attorneys were present from either side.

75.     Juul's attendees once again expressed to Altria's top executives that their withdrawal from the closed-system e-cigarette business was a precondition to reaching a favorable merger deal with Juul.

76.     Altria made several attempts to modify the non-compete term, but Juul reiterated its demands time and time again.

77.     On August 9, 2018, Altria CFO Billy Gifford sent over a markup of the term sheet to Juul's negotiators, Nick Pritzker, Riaz Valani, and Kevin Burns.

78.     On August 15, 2018, Riaz Valani met with Dinny Devitre, another Altria Board member, at Mr. Devitre's New York office. These talks were ultimately unsuccessful.

79.     Negotiations between Juul and Altria were temporarily suspended. While suspended, Altria's executives came to the conclusion that they had to meet Juul's demands if they were to successfully reengage Juul and restart negotiations.

80.     On October 5, 2018, Altria CEO Howard Willard sent Juul's representatives Nick Pritzker, Riaz Valani, and Kevin Burns, a letter stating that Altria would exit the closed-system e-cigarette market. Kevin Burns forwarded Altria's letter to Juul's Chief Legal Officer.

81.     Altria's concessions kicked-off the previously stalled negotiations. Immediately after, Altria began to take the necessary steps to facilitate a possible wind down of its closed-system e-cigarette business.

82.     Altria announced on October 25, 2018, that it was temporarily halting its production and marketing of its MarkTen Elite, under the guise that the pod system and its selection of flavors were contributing to youth usage. However, just a few days later, Altria and Juul agreed to the deal's basic terms. Part of these terms specifically included that Altria cease competition in the e-cigarette market.

83.     Altria announced on December 19, 2018, that it was winding down its remaining e-cigarette business, including its MarkTen product line.

84.     Just one day later, on December 20, 2018, Altria announced its decision to discontinue its e-cigarette operations.  Juul and Altria then executed the Transaction whereby Altria invested $12.8 billion and in return, Juul issued stock to Altria amounting to a 35% ownership stake in the company.

85.     This anticompetitive transaction eliminated routes to other potential acquisitions or partnerships through which Altria might have participated in the relevant market.

86.     Juul's conduct in executing the deal with Altria unreasonably restrained competition in the U.S. market for closed-system e-cigarettes, including: (i) eliminating competition in the market between Juul and Altria, thereby eliminating price competition; (ii) eliminating current and future innovation between Juul and Altria; and (iii) eliminating competition between Juul and Altria for shelf space at retailers throughout the United States.

87.     Altria's agreement to leave the relevant e-cigarette market eliminated one of Juul's main competitors. As one the nation's largest tobacco companies with longstanding business relationships with national retailers, Altria otherwise had the resources and infrastructure to drive sales and compete aggressively.

88.     Before the shut-down of Altria's closed-system e-cigarette business, Juul and Altria relied on price promotions to boost sales of their e-cigarettes. Each checked up on one another's pricing in formulating its own pricing model. Altria's decision to withdraw MarkTen brought competition to a halt.

89.     Juul and Altria also competed through various product innovations. Juul pioneered various pod-based e-cigarettes which prompted Altria to commit significant resources toward developing e-liquid formulations with nicotine salts and higher nicotine concentrations.

90.     Altria leveraged its ownership of its flagship tobacco brands and categories in order to secure favorable shelf space at domestic retailers.

91.     In 2018, Altria launched a major campaign to secure shelf space for its tobacco products, including e-cigarettes, offerings retailers discounts, slotting fees, and fixture payments.

92.     After the Juul-Altria transaction, instead of competing and jockeying for shelf space, Altria leased its shelf space to Juul. This effectively replaced its own MarkTen products.

93.     FTC documents from Defendants make apparent that before committing to the transaction, Altria intended on remaining in the relevant market long-term.

94.     Altria's documents produced to the FTC and its executive statements evidence their acknowledgement that e-cigarettes were the thriving new future of the tobacco industry and committed to participating in that trend.

95.     For example, Altria's former CEO Martin Barrington, stated to investors in February 2018: "So we'll be clear: We aspire to be the U.S. leader in authorized, non-combustible, reduced-risk products."

96.     Additionally, Altria's current CEO Howard Willard told the *Wall Street Journal* in March 2019: "At a time when e-vapor is going to grow rapidly and likely cannibalize the consumers we have in our core business, if you don't invest in the new areas you potentially put your ability to deliver that financial result at risk."

97.     Altria circumvented competing in the e-cigarette market by anticompetitively investing in its upstart competitor. Altria abandoned competition in exchange for a significant share of Juul's profits resulting from a significantly less competitive marketplace.

**VII.    LACK OF COUNTERVAILING FACTORS**

98.    There is a lack of procompetitive benefits to the Transaction, particularly because Juul already maintained approximately 75% of the relevant market share, and the Transaction eliminated Juul's main competitor, Altria.

99.    Entering the relevant market is an extremely difficult task for a new entrant, especially in light of the significant monopoly power Juul had prior to the transaction and the increased market power it now has after the Transaction.

100.    It is now even more difficult and less appealing of an option to enter the relevant market. A new market participant would need to engage to: (i) develop or acquire a product; (ii) manufacture a quality product and scale; (ii) obtain shelf space in retail outlets; (iv) develop a marketing strategy to gain appeal of its product; (v) develop a distribution system; and (vi) successfully sell the product.

101.    Before it even does that, however, a new market participant would need to submit a Premarket Tobacco Product Application ("PMTA") to, and get approval from, the FDA. A PMTA requires significant resources that can add up to millions of dollars for each product for which approval is sought.  At the time of the Transaction, Altria and Juul were not required to submit a PMTA *until August 8, 2022*, because they were on the market prior to August 8, 2016.  This saved Altria and Juul a significant amount of time (which led to additional profits) and resources (which increased their profit margins). This added requirement and expenditure of resources for new market participants, *before they are allowed to generate revenue*, increases the practical difficulties in entering the market.

102.    But once it jumps through all those regulatory hurdles, if it successfully does so, it must still *effectively* compete with Juul, which now has over 80% of the market share and benefits from the resources, brand power, and efforts of itself and of Altria. Significantly, a new market participant is highly unlikely to effectively secure favorable shelf space at retail outlets and to develop its name brand to the point where it can be a real market competitor.

103.    Other existing competitors in the relevant market also cannot effectively replace the competition eliminated by the Transaction, substantially for the same reasons listed above:

(i) they lack Altria's brand strength to secure favorable shelf space at retail outlets; (ii) they lack the substantial resources Altria had at its disposal to commit to e-cigarette research and development as well as to pursuing regulatory approval; and/or (iii) the FDA's enforcement of restrictions on e-liquid flavors has negatively impacted the competitive presence of closed-system competitors other than Juul, who has voluntarily discontinued its flavors.

104.    Additionally, open-system e-cigarette market participants are extremely unlikely to replace the lost competition because they are now required to submit a PMTA by May 12, 2020 in order to stay on the market. Subsequently, if their PMTA is denied, they must immediately remove their products from the market. As a result, many of these participants are simply unable to afford a costly and complicated regulatory hurdle and thus will shut down in the very near future.

105.    As discussed above, open-system e-cigarette products are largely sold in separate specialty vape shop sales channels and thus an expansion into retail outlets like convenience stores (where closed-system e-cigarettes are typically sold) is extremely unlikely given the unique selection of e-liquids and parts offered for open-system products and the related high level of customer service that is simply unattainable in a convenience store.

106.    The Transaction has no procompetitive benefits or efficiencies sufficient to rebut the presumption that the Transaction substantially lessens competition in the relevant market.

## **CLASS ACTION ALLEGATIONS**

107.    Plaintiff, Matthew Blomquist, brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself and all others similarly situated, as representative of the following Class:

> All persons or entities in the United States that purchased e-cigarettes from Juul from December 19, 2018, through present (the "Class Period").

108.    Excluded from the Class are affiliates, predecessors, successors, officers, directors, agents, servants, or employees of Defendant, and the immediate family members of such persons. Also excluded are any trial judge who may preside over this action and their law clerks, court personnel and their family members, and any juror assigned to this action.

109.    Plaintiff reserves the right to amend the Class definition if discovery and/or further investigation reveal that it should be modified.

110.    The members of the Class are so numerous that the joinder of all members of the Class in single action is impractical. Juul operates nationally and has a substantial customer base, as evidenced by its anticipated $3.4 billion revenue for the 2019 year. The Class members are readily identifiable from information and records in Defendant's possession, custody, or control.

111.    There are common questions of law and fact to the Class members, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

a.      Whether Defendants' conduct constitutes a violation of the federal antitrust laws;

b.      Whether the U.S. market for closed-system e-cigarettes constitutes a relevant market;

c.      Whether Juul possesses sufficient market power in the relevant market to cause anticompetitive effects;

d.      Whether Juul possesses monopoly power in the relevant market;

e.      Whether Defendants' conduct caused anticompetitive effects in the relevant market;

f.      Whether Defendants monopolized or attempted to monopolize the U.S. market for closed-system e-cigarettes; and

g.      Whether Defendants' conduct caused Plaintiff and the Class to pay supracompetitive prices for closed-system e-cigarettes.

112.    Plaintiff's claims are typical of those of other Class members because Plaintiff, like every other Class member, paid supracompetitive prices for closed-system e-cigarettes.

113.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained competent counsel experienced in litigating complex class actions, including antitrust and consumer class actions. Plaintiff intends to prosecute this action vigorously. Plaintiff's claims are typical of the claims of all of the other Class members, and

1  Plaintiff has the same non-conflicting interests as the other Class members. Therefore, the

2  interests of the Class members will be fairly and adequately represented by Plaintiff and his

3  counsel.

4        114.  A class action is superior to other available methods for the fair and efficient

5  adjudication of this controversy. The adjudication of this controversy through a class action will

6  avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted

7  claims. There will be no difficulty in managing this action as a class action, and the disposition

8  of the claims of the Class members in a single action will provide substantial benefits to all

9  parties and to the Court. Damages for any individual Class member are likely insufficient to

10  justify the cost of individual litigation so that, in the absence of class treatment, Defendant's

11  violations of law inflicting damages in the aggregate would go unremedied.

12        115.  Class certification is appropriate under Federal Rules of Civil Procedure 23(a)

13  and (b)(2) because Defendant has acted or refused to act on grounds generally applicable to the

14  Class, such that final injunctive or corresponding declaratory relief is appropriate to the Class as

15  a whole.

16  **<u>CLAIMS FOR RELIEF</u>**

17  **<u>FIRST CLAIM FOR RELIEF</u>**

18  **Violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1)**

19  **(Conspiracy in Restraint of Trade)**

20        116.  Plaintiff repeats, realleges, and incorporates by reference the allegations

21  contained in each and every paragraph above, as though fully stated herein.

22        117.  Defendants entered into a series of unlawful agreements that resulted in an

23  unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Antitrust Act,

24  15 U.S.C. § 1, *et seq*.

25        118.  During the Class Period, Defendants entered into a series of agreements designed

26  to unlawfully concentrate Juul's market power for closed-system e-cigarettes.

27        119.  In order to increase Juul's market share, Altria agreed to exit the market for

28  closed-system e-cigarettes, provide valuable intellectual property, necessary marketing and

CLASS ACTION COMPLAINT                                                   23

distribution, and access to Altria's highly coveted shelf space in convenience stores across the United States. Altria, in return, benefitted by receiving a portion of Juul's excessive profits by virtue of its 35% interest in Juul.

120.    These agreements ultimately restrained trade and resulted in higher prices and less competition and innovation in the market.

121.    Defendants' conduct caused injury to Plaintiff and members of the Class who purchased closed-system e-cigarettes from Defendants at supracompetitive prices that they would not have otherwise paid in a competitive market.

122.    Defendants' conduct constitutes a *per se* violation of § 1 of the Sherman Antitrust Act. Alternatively, under the rule of reason Defendants' conduct constitutes a violation of § 1 of the Sherman Antitrust Act. Defendants' conduct resulted in substantial anticompetitive effects, including: (i) eliminating competition in the market between Juul and Altria, thereby eliminating price competition; (ii) eliminating current and future innovation between Juul and Altria; and (iii) eliminating competition between Juul and Altria for shelf space at retailers throughout the United States.

123.    As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Antitrust Act, Plaintiff and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

124.    Plaintiff and members of the Class are each entitled to seek treble damages sustained in the market for closed-system e-cigarettes as a result of Defendants' violations of § 1 of the Sherman Antitrust Act under § 4 of the Clayton Act alleged herein.

125.    Plaintiff and members of the Class are each entitled to seek declaratory and injunctive relief under § 1 of the Sherman Antitrust Act, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

**SECOND CLAIM FOR RELIEF**

**Violation of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2)**

**(Monopolization)**

126.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in each and every paragraph above, as though fully stated herein.

127.    Defendants, as alleged in the complaint, have monopoly power in the close-system domestic e-cigarette market.

128.    Defendants willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain a monopoly in that market in violation of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

129.    Defendants entered into and engaged in continuing unlawful agreements for the purpose of further monopolizing the market for closed-system e-cigarettes.

130.    Defendants' conduct alleged in the complaint had the following anticompetitive effects: (i) eliminating competition in the market between Juul and Altria, thereby eliminating price competition; (ii) eliminating current and future innovation between Juul and Altria; and (iii) eliminating competition between Juul and Altria for shelf space at retailers throughout the United States.

131.    As a direct, material, and proximate result of Defendants' violation of § 2 of the Sherman Antitrust Act, Plaintiff and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

132.    Plaintiff and members of the Class are each entitled to seek declaratory and injunctive relief under § 2 of the Sherman Antitrust Act, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

**THIRD CLAIM FOR RELIEF**

**Violation of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2)**

**(Attempted Monopolization)**

133.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in each and every paragraph above, as though fully stated herein.

134.    Defendants have monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the relevant e-cigarette market.

135.    Defendants have willfully, knowingly, and with specific intent to do so, attempted to monopolize the relevant e-cigarette market in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

136.    Defendants' anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the relevant e-cigarette market.

137.    Defendants' ongoing anticompetitive conduct presents a dangerous probability that Defendants will succeed, to the extent they have not already, in its attempt to monopolize the relevant market.

138.    Plaintiff and members of the Class are each entitled to seek declaratory and injunctive relief under § 2 of the Sherman Antitrust Act, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## FOURTH CLAIM FOR RELIEF

### Violation of Section 7 of the Clayton Act (15 U.S.C. § 18)

139.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in each and every paragraph above, as though fully stated herein.

140.    The merger transaction between Altria and Juul, in which Altria received a substantial ownership stake in Juul and for the purposes of which Altria withdrew its existing e-cigarettes from the market and halted its innovation on future products, substantially lessened competition in the U.S. market for closed system e-cigarettes.

141.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the class were injured in their business or property. Plaintiff and class members bring this claim seeking treble damages under Section 7 of the Clayton Act, 15 U.S.C. § 18.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Matthew Blomquist, individually and on behalf of the Class, respectfully requests that the Court:

A.      Certify the Class pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure and order that notice be provided to all Class members;

B.      Designate Plaintiff Matthew Blomquist as representative of the Class and the undersigned counsel as Class Counsel;

C.      Award Plaintiff and the Class compensatory damages in an amount to be determined by the Court and treble and punitive damages to punish Defendants' egregious conduct as described herein, and to deter Defendants and others from engaging in similar conduct;

D.      Award Plaintiff and the Class injunctive relief, as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices set forth herein;

E.      Award Plaintiff and the Class statutory interest and penalties;

F.      Award Plaintiff and the Class their costs, prejudgment and post judgment interest, and attorneys' fees; and

G.      Grant such other relief that the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues stated herein, and all issues so triable.

Dated: April 13, 2020                    Respectfully submitted,

**BERMAN TABACCO**

By:   _/s/ Todd A. Seaver_
        Todd A. Seaver

Matthew D. Pearson
Carl Hammarskjold
Colleen Cleary
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382
Email: tseaver@bermantabacco.com
        mpearson@bermantabacco.com
        chammarskjold@bermantabacco.com
        ccleary@bermantabacco.com

LOWEY DANNENBERG, P.C.

By:   */s/ Christian Levis*
      Christian Levis (*pro hac vice* forthcoming)

Amanda Fiorilla (*pro hac vice* forthcoming)
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Email: clevis@lowey.com
      afiorilla@lowey.com

Anthony M. Christina (*pro hac vice* forthcoming*)*
**LOWEY DANNENBERG, P.C**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone: (215) 399-4770
Email: achristina@lowey.com

*Attorneys for Plaintiff Matthew Blomquist*